[Cite as *State v. Davis*, 2022-Ohio-1875.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

STATE OF OHIO                          :
                                       :
    Plaintiff-Appellee             :      Appellate Case No. 29243
                                       :
v.                                     :      Trial Court Case No. 2021-CR-662
                                       :
DARRYLL B. DAVIS, II                   :      (Criminal Appeal from
                                       :      Common Pleas Court)
    Defendant-Appellant            :
                                       :

. . . . . . . . . . .

O P I N I O N

Rendered on the 3rd day of June, 2022.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by LISA M. LIGHT, Atty. Reg. No. 0097348, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee

ANGELINA N. JACKSON, Atty. Reg. No. 0077937, Assistant Public Defender, 117 South Main Street, Suite 400, Dayton, Ohio 45422
    Attorney for Defendant-Appellant

. . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Defendant-appellant, Darryll B. Davis, II, appeals from his conviction in the Montgomery County Court of Common Pleas after he pled no contest to one count of having weapons while under disability. In support of his appeal, Davis argues that the trial court erred by failing to suppress evidence and statements that were obtained by police officers who entered his hotel room and asked if he had any weapons. For the reasons outlined below, the judgment of the trial court will be affirmed.

## Facts and Course of Proceedings

{¶ 2} On March 4, 2021, a Montgomery County grand jury returned an indictment charging Davis with one count of having weapons while under disability in violation of R.C. 2923.13(A)(2), a felony of the third degree. The charge arose after three Huber Heights police officers entered Davis's hotel room to execute a warrant for Davis's arrest for an aggravated burglary in Columbus, Ohio. After entering the hotel room, one of the officers asked Davis if he had a gun, and Davis, who had a prior felony conviction of violence, responded affirmatively. The same officer then asked Davis where the gun was located, and Davis advised that the gun was in the drawer of a nearby nightstand. The officers thereafter recovered the gun from the nightstand and arrested Davis on the warrant for aggravated burglary.

{¶ 3} Following his arrest, Davis was indicted for the aforementioned charge of having weapons while under disability. Davis pled not guilty to the charge and filed a motion to suppress all evidence and statements that were obtained as a result of the

officers questioning him and searching his hotel room. On April 30, 2021, the trial court held a hearing on Davis's motion to suppress. Officer Scott Short of the Huber Heights Police Department was the only witness to testify at the hearing. The only other evidence admitted at the hearing was video footage from a body camera worn by Officer Short and a copy of Officer Short's *Miranda* card. *See* State's Exhibit Nos. 1 and 2. The following is a summary of the testimony and evidence presented at the hearing.

{¶ 4} On February 25, 2021, Officer Short was conducting an unrelated investigation at a hotel known as the Baymont Inn in Huber Heights, Ohio. As part of that investigation, Officer Short was running license plates in the hotel's parking lot. In doing so, Officer Short discovered that the registered owner of a silver Chevy SUV—Davis—had a warrant for his arrest out of Columbus, Ohio, for aggravated burglary. After discovering the warrant, Officer Short called for backup assistance. Officer Short then entered the hotel, confirmed that Davis was a registered guest, and obtained Davis's hotel room number. Once he had this information, Officer Short waited for the backup officers to arrive at the hotel.

{¶ 5} Officers Champ and Diltz of the Huber Heights Police Department arrived at the hotel a few minutes later. Officer Diltz arrived with an additional rifle for safety purposes. When Officer Short saw the rifle, he asked Officer Diltz if he had received additional information about the warrant from someone in Columbus. Officer Diltz responded affirmatively and advised that his contact in Columbus had told him that the warrant was issued on January 21, 2021, for a first-degree felony burglary that involved either physical harm or a firearm.

**{¶ 6}** After discussing the warrant, the three officers made their way to Davis's hotel room. Once there, Officer Short told the other officers: "Remember, we need to clear the bathroom." Officer Short then knocked on the door and asked the occupant if he was "Darryll." Davis did not open the door but confirmed his identity as Darryll. Officer Short then said: "Hey, it's Huber Heights Police can you open up the door?" To this, Davis said: "Can you come to the peep hole so I can see who you are?" Officer Short responded: "I'm not going to stand in front of the doorway, you'll have to trust us that it's Huber Heights Police." Davis then said: "Alright give me a second to get some clothes on." Officer Short, however, told Davis: "Just go ahead and open the door we'll get that taken care of later." Davis then opened the door wearing only a pair of boxer or gym shorts.

**{¶ 7}** When Davis opened the door, the body camera video shows that he was standing about three feet inside the hotel room, close to the end of the open door. Davis was unclothed but actively pulling up his shorts. Officer Short asked to see Davis's hands and asked if anyone else was in the room. Davis said no. Officer Short then asked Davis to "step on back" and to "have a seat" and informed Davis that he would explain why he and the other officers were there. After Davis sat on the bed, Officer Short said: "We just want to make sure no one else is in the room, OK? That's all."

**{¶ 8}** While Davis was sitting on the bed, Officer Short proceeded to explain why the officers were there. Specifically, Officer Short told Davis that he had been running license plates and that he had come across a warrant for Davis's arrest. Davis said that he knew he had a warrant and proceeded to explain his situation to the officers. As Davis

was speaking, Officer Short advised dispatch on his radio that he was in the room with Davis and asked for confirmation of the arrest warrant.

{¶ 9} Officer Short explained to Davis that once the arrest warrant was confirmed, he would be taken to jail. As a result, Officer Short asked Davis if there was anyone Davis could call that lived near the hotel so that his belongings could be retrieved from the hotel room. In response, Davis said that his sister lived nearby and that he could call her. Davis then stood up from the bed and said: "You all came up here because you ran my tags?" Officer Short responded affirmatively and once again explained that he was running license plates when he discovered that Davis had a warrant for aggravated burglary.

{¶ 10} During that conversation, Davis, who was still standing, reached for his cell phone on the bed. Officer Short then said: "If you would, I don't care if you use your phone, but if you don't mind having a seat for me. You don't have anything any guns any knives anything around here?" Davis did not immediately respond to Officer Short's question. Officer Short then said: "Darryll? You got a gun nearby?" Davis responded: "Yup."

{¶ 11} Following Davis's response, Officer Short ordered Davis to turn around and Officer Champ proceeded to handcuff Davis. While Davis was being handcuffed, Officer Short asked Davis where the gun was located. Davis responded and indicated that the gun was in the nightstand drawer. Officer Short then retrieved the gun from the nightstand drawer, removed the gun's magazine, and ejected a single round. Officer Diltz then asked Davis if he had ever been convicted of a felony of violence and Davis

responded affirmatively.

{¶ 12} After securing Davis's gun, Officer Short grabbed a pair of Davis's pants from a nearby chair and searched the pockets before helping Davis put on the pants. Officer Champ then buttoned Davis's pants while Officer Short grabbed a shirt for Davis to wear. Officer Short inspected the shirt and then put the shirt over Davis's head and shoulders. After Davis was dressed, Officer Short permitted Davis to use his cell phone to call his sister and his children while the officers awaited confirmation of the arrest warrant.

{¶ 13} A few minutes later, Officer Short notified Davis that the arrest warrant had been confirmed and that Davis was being arrested on the warrant. Officer Short then read Davis his *Miranda* rights, which Davis indicated he understood. Once Davis confirmed that he understood his *Miranda* rights, Officer Short asked Davis if he was willing to speak with him about the gun found in the nightstand. Davis indicated that he was willing to talk about the gun and stated that his friend had left the gun in his vehicle many years ago after being arrested at a bar. Davis explained that he had simply kept the gun and brought it with him to Dayton. Davis also told Officer Short that he had been convicted for murder in Georgia 15 years ago.

{¶ 14} Following that conversation, Officer Short let Davis contact another family member on his cell phone. After Davis was finished talking on the phone, Officer Champ helped Davis put on his shoes. Davis's sister arrived shortly thereafter to collect Davis's belongings. Officer Short spoke with Davis's sister and obtained her identification information while Officer Champ placed Davis in a police cruiser so that Davis could be

transported to jail.

{¶ 15} After the foregoing information was presented at the suppression hearing, the trial court ordered the parties to file simultaneous briefs that addressed the issues presented by the evidence. Davis filed a brief arguing two specific issues in support of his motion to suppress. Those issues where: (1) that the officers' entry into his hotel room was an unlawful, warrantless entry because the officers had not confirmed the arrest warrant before entering; and (2) that the officers conducted a custodial interrogation in violation of *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), for which the public safety exception did not apply.

{¶ 16} On July 15, 2021, the trial court announced that it was overruling Davis's motion to suppress and stated its reasoning for that decision on the record. The trial court thereafter issued a written decision and entry overruling Davis's motion. In reaching its decision, the trial court concluded that even though the arrest warrant had not been confirmed by the Columbus Police Department prior to the officers entering Davis's hotel room, the officers had taken "necessary precautions" to ensure that there was an active arrest warrant tied to Davis. The trial court held that under *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), the officers were constitutionally permitted to enter Davis's hotel room in order to execute the arrest warrant. The trial court also concluded that the public safety exception to the *Miranda* rule announced in *New York v. Quarles*, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984), applied to Officer Short's pre-*Miranda* questioning about whether Davis had a weapon nearby and the location of the weapon.

{¶ 17} After the trial court overruled Davis's motion to suppress, Davis pled no contest to having weapons while under disability. The trial court accepted Davis's no contest plea and found him guilty as charged. The trial court then sentenced Davis to community control sanctions for a period not to exceed five years. Davis now appeals from his conviction, raising a single assignment of error for review.

**Assignment of Error**

{¶ 18} Under his sole assignment of error, Davis contends that the trial court erred by overruling his motion to suppress. Specifically, Davis argues that the trial court should have suppressed the gun and the statements made during the hotel room encounter because the arresting officers: (1) entered the hotel room without knowing whether there was a valid warrant for his arrest; (2) conducted a custodial interrogation in the hotel room without advising him of his *Miranda* rights; and (3) conducted a warrantless search of the hotel room nightstand. We will address each of these claims separately below.

*Standard of Review*

{¶ 19} "Appellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." (Citation omitted.) *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. "Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. * * *

Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." (Citations omitted.) *Id.*

*Entry into Hotel Room*

**{¶ 20}** For his first argument, Davis contends that the officers' entry into his hotel room violated his Fourth Amendment rights because the officers did not know whether there was a valid warrant for his arrest at the time they entered his room. Davis claims that the officers did not know there was a valid warrant because they had not yet confirmed the warrant with the Columbus Police Department. According to Davis, this necessitated the suppression of the gun and the statements made in the hotel room. We disagree.

**{¶ 21}** The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton*, 445 U.S. 573 at 586, 100 S.Ct. 1371, 63 L.Ed.2d 639, quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 477-478, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). Therefore, "[t]he Fourth Amendment generally prohibits police from making a warrantless, nonconsensual entry into a suspect's home to make a felony arrest." *State v. Cooks*, 2d Dist. Clark No. 2016-CA-40, 2017-Ohio-218, ¶ 10, citing *Payton* at 588-589.

**{¶ 22}** "[A] person subject to an arrest warrant[, however,] does not enjoy the full

panoply of privacy rights that other individuals enjoy." *State v. Gardner*, 135 Ohio St.3d 99, 2012-Ohio-5683, 984 N.E.2d 1025, ¶ 22. " '[A]n arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within.' " *State v. Martin*, 151 Ohio St.3d 470, 2017-Ohio-7556, 90 N.E.3d 857, ¶ 78, quoting *Payton* at 603. Therefore, " 'an arrest warrant is sufficient to enter a person's residence to effectuate the warrant if the police have reason to believe that the suspect lives in the home and is in fact at the home at the time the arrest warrant is executed.' " *Cooks* at ¶ 10, quoting *State v. Zerucha*, 11th Dist. Ashtabula No. 2015-A-0031, 2016-Ohio-1300, ¶ 13. (Other citation omitted.) In applying this principle it is "presuppose[d] that the police knew that there was a warrant for the individual's arrest when entering a home to make an arrest." *Gardner* at ¶ 22.

{¶ 23} " 'The protections against warrantless intrusions into the home * * * apply with equal force to a properly rented hotel room during the rental period.' " *State v. Chavez,* 2d Dist. Montgomery No. 27840, 2018-Ohio-4351, ¶ 21, quoting *United States v. Junkman*, N.D. Iowa No. CR96-4033, 1997 WL 33559171, *3 (June 24, 1997), citing *United States v. Rambo*, 789 F.2d 1289, 1295 (8th Cir.1986) and *United States v. Wicks*, 995 F.2d 964, 969 (10th Cir.1993). *Accord Hoffa v. United States*, 385 U.S. 293, 301, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966), citing *United States v. Jeffers*, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951) ("[a] hotel room can clearly be the object of Fourth Amendment protection as much as a home or an office"). Therefore, if the person named in the arrest warrant is a tenant taking up residence in the hotel room, officers are permitted to enter

the room to effectuate the arrest warrant if they have a reasonable belief that the person named in the arrest warrant is a tenant and present inside the room.  *Chavez* at ¶ 23, citing *Payton* at 603.

{¶ 24} Based on the testimony and evidence presented at the suppression hearing, the trial court found that there was an active warrant for Davis's arrest with respect to an aggravated burglary in Columbus, Ohio.   The trial court also found that the arresting officers were aware of the warrant before they entered the hotel room to arrest Davis.   Although the trial court found that the officers did not confirm the warrant with the Columbus Police Department before entering Davis's hotel room, the trial court determined that the officers had taken "necessary precautions" to ensure that there was an arrest warrant tied to Davis before they entered the room.   The trial court further found that the officers verified with the hotel clerk that Davis was the individual who had rented the hotel room in question, and that the officers confirmed that Davis was inside the hotel room by knocking on the door and having Davis identify himself.   Based on these findings, the trial court held that the officers' entry into the hotel room was constitutionally permissible.

{¶ 25} Upon review, we find that the trial court's factual findings were supported by competent, credible evidence.   The testimony of Officer Short and the body camera video footage admitted into evidence established that Officer Short ran Davis's license plate and discovered that Davis had an active warrant for his arrest out of Columbus. The body camera video footage also established that Officer Short had a conversation with the other two responding officers—Officers Champ and Diltz—about Davis's arrest

warrant before they contacted Davis in his hotel room. During that conversation, Officer Short asked if Officer Diltz had contacted "somebody from Columbus."[1] Officer Diltz responded affirmatively and indicated that the contact person from Columbus had advised him that a first-degree felony arrest warrant for a burglary had been issued for Davis just one month earlier on January 21, 2021, and that the burglary in question involved either physical harm or a firearm. Although none of the officers expressly described Officer Diltz's contact person as a law enforcement officer, the trial court nevertheless made a finding to that effect. Given the level of detail the contact person provided Officer Diltz about the warrant, we find that said finding was supported by competent, credible evidence.

{¶ 26} The trial court's finding that the warrant was not confirmed by the Columbus Police Department before the officers entered Davis's hotel room was also supported by competent, credible evidence. However, under the specific circumstances of this case, we do not find that the lack of confirmation amounted to a Fourth Amendment violation, because the officers had already determined that an active arrest warrant existed when Officer Short ran Davis's license plate and when Officer Diltz spoke to a Columbus officer regarding the warrant. Moreover, during his testimony, Officer Short explained that "we have to make sure we speak with the individual and have them secured before we confirm a warrant." Suppression Trans. (Apr. 30, 2021), p. 20. Therefore, the fact that the officers had not yet confirmed the warrant with the Columbus Police Department did not

---

[1] Officer Short also testified that "Officer Diltz had made a phone call to an acquaintance of his who worked for Columbus" and that said acquaintance "had some familiarity with the case[.]" Suppression Trans. (Apr. 30, 2021), p. 11.

mean that the officers were unaware of a valid arrest warrant at the time they entered Davis's hotel room.   Davis's claim otherwise lacks merit.

{¶ 27} As an alternative argument, Davis contends that if the officers were indeed aware of a valid arrest warrant, the officers should have arrested him on the warrant immediately when he answered the door to his hotel room as opposed to coming inside the room and waiting to have the warrant confirmed.   According to Davis, the officers' entry into his hotel room was unnecessary and unjustified.

{¶ 28} In support of his argument, Davis cites to this court's decision in *State v. Cooper*, 2d Dist. Montgomery No. 20845, 2005-Ohio-5781.   In *Cooper*, a detective and nine other law enforcement officers arrived at Cooper's residence with the intent to arrest Cooper on an outstanding warrant for driving under the influence and to question him about a department store robbery.   *Id.* at ¶ 4.   The following chain of events occurred during Cooper's arrest:

> The officers surrounded [Cooper's] house, and [the detective] knocked on the front door with his gun drawn.   When Cooper opened the door appearing sleepy and shirtless, [the detective] identified himself as a police detective.   He then explained that he had a warrant for Cooper's arrest and that Cooper also was a suspect in the robbery of an Elder–Beerman store.   Cooper responded by allowing himself to be handcuffed. When he handcuffed Cooper, [the detective] was standing on the front porch, and Cooper was standing either on the porch or in the doorway. After taking Cooper into custody, [the detective] and the other officers put

their weapons away and "stepped inside the house." [The detective] then placed Cooper on a couch. On a chair across from the couch, [the detective] observed a blue jacket. It appeared to be the same jacket [the detective] previously had observed being worn by the perpetrator when viewing a surveillance videotape of the robbery.

*Id.*

{¶ 29} Although the detective in *Cooper* had an arrest warrant, this court held that the officers' entry into Cooper's home violated the Fourth Amendment because "the arrest was 'effected' when [the detective] handcuffed Cooper while standing on the front porch." *Id.* at ¶ 17. In so holding, we found that the detective "never offered any justification for his warrantless entry into the home after handcuffing Cooper without incident while standing on the front porch." *Id.* at ¶ 16. This court also found that "[n]othing in the record indicate[d] that [Cooper] subsequently invited the officers into the home or that he asked to retrieve a shirt prior to be taken to the Dayton Safety Building." *Id.* at ¶ 17. "Instead, [the detective] and the other officers simply 'stepped into' the residence uninvited to talk to Cooper about the Elder-Beerman robbery." *Id.*

{¶ 30} In deciding *Cooper*, this court relied on *United States v. Albrektsen,* 151 F.3d 951, 953-954 (9th Cir.1998), for the proposition "that officers may not enter a dwelling to arrest a defendant who is capable of being seized at the door." *Cooper* at ¶ 17. In *Albrektsen*, an officer had an arrest warrant for a defendant who was residing in a motel room. *Albrektsen* at 952. The officer knocked on the defendant's motel-room door and the defendant answered and immediately admitted his identity to the officer in

the doorway. *Id.* Instead of arresting the defendant right then and there, the officer walked into the defendant's motel room without permission and asked the defendant if he could conduct a search. *Id.* at 952-953. After the defendant consented to the search, the officer arrested the defendant, searched the motel room, and discovered criminal evidence therein. *Id.* at 953.

{¶ 31} Under this set of facts, the Ninth Circuit Court of Appeals determined that the officer could have arrested the defendant in the doorway and that it was unnecessary to arrest the defendant inside the motel room. *Id.* at 953-954. In so holding, the court stressed that under the United States Supreme Court's decision in *Payton,* an arrest warrant carries a *limited* authority for officers to enter a dwelling in which the suspect lives, and that the limited authority applies when there is reason to believe the suspect is *within* the dwelling. *Id.* at 953. Because it was unnecessary for the officer to arrest the defendant in "the depths of the room" the court in *Albrektsen* held that entering the motel room was an invasion of the defendant's privacy that was not authorized by the constitution. *Id.* at 954.

{¶ 32} Based on *Cooper* and *Albrektsen*, Davis claims that even if there was a valid warrant for his arrest, the officers' entry into his hotel room to execute the warrant was not constitutionally permissible because the officers could have arrested him in the hallway when he answered the door. *Cooper* and *Albrektsen*, however, are distinguishable from this case, because unlike in *Cooper and Albrektsen*, it was reasonable for the officers to enter Davis's hotel room.

{¶ 33} "The touchstone of our analysis under the Fourth Amendment is always 'the

reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.' " *Pennsylvania v. Mimms*, 434 U.S. 106, 108-109, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977), quoting *Terry*, 392 U.S. 1 at 19, 88 S.Ct. 1868, 20 L.Ed.2d 889. " 'The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application.' " *State v. Cremeans*, 160 Ohio App.3d 1, 2005-Ohio-928, 825 N.E.2d 1124, ¶ 14 (2d Dist.), quoting *Bell v. Wolfish*, 441 U.S. 520, 559, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). " 'In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails.' " *Id.* " 'Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.' " *Id.* "An action is 'reasonable' under the Fourth Amendment, regardless of an individual officer's state of mind, "as long as the circumstances, viewed *objectively,* justify [the] action.' " (Emphasis sic.) *Brigham City v. Stuart*, 547 U.S. 398, 404, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006), quoting *Scott v. United States*, 436 U.S. 128, 138, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978).

{¶ 34} In *Cooper,* it was not reasonable for the detective to enter the defendant's dwelling because the officer had already executed the arrest warrant by arresting the defendant on his front porch. In *Albrektsen*, it was not reasonable for the officer to conduct the arrest of the defendant inside the defendant's motel room because there was simply no reason for the officer to enter the room once the defendant answered the door and identified himself. In the instant case, however, it was reasonable for the officers to enter Davis's hotel room because Davis was only in his shorts at the time he answered

the door and because the encounter occurred during the winter month of February. Under these circumstances, even if the officers had done as Davis suggested and arrested him in the hallway, the officers still would have had to enter the hotel room in order to check for the presence of other persons and to get some clothes and shoes for Davis to wear to jail. The body camera video shows that much of the time spent in the hotel room was dedicated to helping Davis make arrangements with his sister to retrieve his belongings after the arrest rather than taking actions in furtherance of evidence collection.

{¶ 35} Taking this into consideration, it was reasonable for the officers to simply discuss the arrest warrant with Davis inside the hotel room and to arrest him there as opposed to arresting him closer to the doorway and then moving him to the hallway while Davis was only partially clothed. Going inside the hotel room also served the additional purpose of ensuring that no one else was in the room who could have harmed the officers while they were in the process of arresting Davis.

{¶ 36} In so holding, we note that Officer Short's order for Davis to open the door before getting dressed was also reasonable since Davis did not immediately answer the door and since Davis asked the officers to stand by the peephole, as such conduct presented a possible safety concern. Getting Davis to open the door as soon as possible prevented Davis from having time to attempt an escape or to retrieve any kind of weapon or object that could have harmed the officers. Therefore, the fact that Officer Short ordered Davis to open the door before getting dressed does not alter our reasonableness determination.

{¶ 37} Although the officers could have arrested Davis earlier and closer to the doorway, and then could have led Davis to the hallway partially clothed, the decision not to do so was reasonable for all the aforementioned reasons. Accordingly, we conclude that the officers' entry into Davis's hotel room for purposes of executing his arrest warrant did not offend constitutional provisions and thus did not warrant the suppression of Davis's gun or his statements. Davis's claim otherwise lacks merit.

*Questioning in Hotel Room*

{¶ 38} For his second argument, Davis contends that the trial court should have suppressed the statements he made to the officers regarding his gun and the gun itself because the officers conducted a custodial interrogation without advising him of his *Miranda* rights. Specifically, Davis contends that the trial court erroneously applied the public safety exception to the *Miranda* rule. We disagree.

{¶ 39} "The Fifth Amendment to the United States Constitution provides that no person shall be compelled to be a witness against himself. In order to ensure that this right is protected, statements resulting from custodial interrogations are admissible only after a showing that the police have followed the procedural safeguards described in *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)." *State v. Mogle*, 2d Dist. Darke No. 2020-CA-2, 2021-Ohio-1741, ¶ 9. "The procedural safeguards which emerged from the *Miranda* decision are the now-familiar warnings which must be given to a suspect prior to a custodial interrogation." *State v. Bowshier*, 2d Dist. Clark No. 2898, 1992 WL 288780, *3 (Oct. 16, 1992).

{¶ 40} In *Quarles*, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550, the United States Supreme Court established a " 'public safety' exception to the requirement that *Miranda* warnings be given before a suspect's answers may be admitted into evidence[.]" *Id.* at paragraph (a) of the syllabus. The public safety exception is a "narrow exception" to the *Miranda* rule whereby "police officers can ask a suspect questions without first giving *Miranda* warnings if they reasonably believe it is 'necessary to secure their own safety or the safety of the public.' " *State v. Neyland*, 139 Ohio St.3d 353, 2014-Ohio-1914, 12 N.E.3d 1112, ¶ 120, quoting *Quarles* at 659. In other words, "[t]he public safety exception allows the police, under certain circumstances, to temporarily forgo advising a suspect of his *Miranda* rights in order to ask questions necessary to securing their own immediate safety or the public's safety." (Citation omitted.) *State v. Strozier*, 172 Ohio App.3d 780, 2007-Ohio-4575, 876 N.E.2d 1304, ¶ 23 (2d Dist.).

{¶ 41} " 'In order to establish that the [public safety] exception is warranted in any given case, the State must show that: (1) there was an objectively reasonable need to protect the police or the public, (2) from an immediate danger, (3) associated with a weapon, and that (4) the questions asked were related to that danger and reasonably necessary to secure public safety.' " (Emphasis omitted.) *Id.* at ¶ 25, quoting *State v. Jergens*, 2d Dist. Montgomery No. 13294, 1993 WL 333649, *2 (Sept. 3, 1993). The "evaluation of the applicability of the [public safety] exception 'takes into consideration a number of factors, which may include the known history and characteristics of the suspect, the known facts and circumstances of the alleged crime, and the facts and circumstances confronted by the officer when he undertakes the arrest.' " *State v.*

*Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, ¶ 117, citing *United States v. Williams*, 483 F.3d 425, 428 (6th Cir.2007).

{¶ 42} "This court has repeatedly applied the public safety exception to permit police officers to question a suspect about the unknown location of a firearm[.]" *State v. Thompson-Shabazz*, 2017-Ohio-7434, 96 N.E.3d 1146, ¶ 31 (2d Dist.), citing *State v. Brown*, 2d Dist. Montgomery No. 26035, 2014-Ohio-3257. However, the exception is limited. *Jergens* at *2. "It does not apply to all situations in which a suspect is believed to have used a weapon in the commission of a crime and it does not permit officers to ask questions which are not necessary to secure their safety or that of the public." *Id*. Accord *Strozier* at ¶ 25; *Quarles* at 658-59.

{¶ 43} In *Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, the Supreme Court of Ohio declined to apply the public safety exception to a defendant's un-*Mirandized* statements that were made in response to the police questioning the defendant about whether he was armed at the time of his arrest. The evidence in *Maxwell* established that seven officers entered a home to arrest the defendant for a murder that involved a firearm. *Id*. at ¶17-20 and ¶ 110. After entering the home, the officers searched the basement and first floor and found nothing. *Id*. at ¶ 110. The officers then searched the home's two bedrooms on the second floor and found the defendant hiding in a crawl space. *Id*. at ¶ 111. Two of the officers pulled the defendant from the crawl space, placed him face down on the bed, and handcuffed him. *Id*. As the defendant was being handcuffed, one of the officers asked the defendant whether he was armed. *Id*. The defendant responded by saying that "he did not have a gun

anymore" and that he "had gotten rid of the gun that he once had." *Id*.

{¶ 44} The defendant in *Maxwell* moved the trial court to have these statements suppressed on grounds that the officers did not advise him of his *Miranda* rights before questioning him. The trial court, however, applied the public safety exception to the *Miranda* rule and declined to suppress the defendant's statements. *Id*. at ¶ 112. Following an appeal, the Supreme Court of Ohio determined that the public safety exception did not apply because nothing suggested the defendant might gain access to a weapon and inflict harm with it. *Id*. at ¶ 118-119. This is because "[w]hen [the defendant] was questioned, the task force had secured the premises, performed a sweep of the house, and determined that no one else was present." *Id*. at ¶ 118. In addition, the defendant "was handcuffed and surrounded by several task-force members." *Id*. Simply put, "[t]he house was under full control of the agents during the questioning." *Id*. Because there was no safety threat to the police officers or the public, the Supreme Court of Ohio held that the public safety exception did not apply and that the defendant's statements regarding his firearm were improperly obtained in violation of *Miranda*. *Id*. at ¶ 118-122.

{¶ 45} Davis argues that the circumstances in *Maxwell* are analogous to the instant case and prohibit the application of the public safety exception. *Maxwell*, however, is distinguishable because, unlike this case, the defendant in *Maxwell* was handcuffed and secured at the time he was asked about having any weapons. In this case, Officer Short was going to permit Davis, who was not yet handcuffed, to get dressed and call his sister on his cell phone so that she could come and pick up Davis's belongings. It was not until

Davis stood up from the bed and reached for his cell phone that Officer Short asked Davis if he had any guns or knives in the hotel room.

{¶ 46} Officer Short testified that he asked Davis whether he had any guns or knives for purposes of safety because the hotel room was a confined space and because there was bedding on the bed and overnight bags in the room with unknown contents. The trial court found, and the video evidence confirmed, that the hotel room was in fact a confined space and that there was bedding strewn on the bed where Davis was reaching. The video evidence also confirmed that there was an overnight bag in the corner of the room with unknown contents.

{¶ 47} Because the officers merely conducted a brief protective sweep for individuals in the hotel room, the officers had no way of knowing whether there was a weapon accessible to Davis on the bed or elsewhere in the room. Fear of such potential danger was objectively reasonable since the officers were going to let Davis have the freedom of movement to call his sister and get dressed in a confined space. It was also reasonable because the officers knew that Davis had an arrest warrant for a recent burglary that possibly involved a gun. Therefore, we find that there was an objectively reasonable need for Officer Short to ask Davis whether there were any weapons nearby so that the officers could protect themselves from the potential, immediate danger of Davis using a nearby weapon against them. Because Officer Short's question to Davis about whether he had any guns or knives was related to that legitimate concern for danger, we find that the public safety exception applied and thus permitted that question to be asked without giving *Miranda* warnings.

{¶ 48} Davis, however, argues that once he was handcuffed by the officers he no longer presented a risk of harm that justified further questioning about the location of the gun.   We again disagree.

{¶ 49} The public safety exception has long permitted questions to be posed to defendants in handcuffs. *United States v. Williams*, 272 Fed.Appx. 473, 477 (6th Cir.2008).   For example, in *Quarles*, the defendant was chased in a supermarket and placed in handcuffs before the arresting officer noticed that the defendant was wearing an empty gun holster.   *Quarles*, 467 U.S. 649 at 652, 104 S.Ct. 2626, 81 L.Ed.2d 550. When the officer asked the defendant where the gun was, the handcuffed defendant nodded in the direction of some empty cartons and responded that the "gun is over there." *Id.*   In recognizing the public safety exception to *Miranda*, the United States Supreme Court held that the defendant's statement and the gun that was found were both admissible.   *Id.* at 659-60, 104 S.Ct. 2626.   In so holding, the court found that "so long as the gun was concealed somewhere in the supermarket, it posed more than one danger to the public safety: an accomplice might make use of it, or a customer or employee might later come upon it.   *Id.* at paragraph (a) of the syllabus.   This court has also recognized that the public safety exception applies when " 'there is an overriding need to save a human life or to rescue persons whose lives are in danger.' "   *Thompson-Shabazz*, 2017-Ohio-7434, 96 N.E.3d 1146, at ¶ 31, quoting *State v. Luke*, 5th Dist. Stark No. 2003 CA 00413, 2004-Ohio-6137, ¶ 12, citing *Quarles*.

{¶ 50} Similar to leaving a gun in a supermarket, leaving a gun in a hotel room would have posed a danger to public safety and placed lives in danger.   For example,

Davis's sister, who came to pick up Davis's belongings could have hurt herself, the officers, or someone else in the hotel if she had found and retrieved the gun.   A hotel room cleaner or subsequent guests or their children could have come upon the weapon as well.   Accordingly, the public safety exception applied to Officer Short's question about the location of the gun while Davis was being handcuffed.   For all the foregoing reasons, Davis's claim that the public safety exception did not apply to Officer Short's pre-*Miranda* questions regarding the gun lacks merit.

*Search of Hotel Room Nightstand*

{¶ 51} For his last argument, Davis contends that his gun should be suppressed as evidence because it was obtained via a warrantless search of the hotel room nightstand in violation of his Fourth Amendment rights.   Davis, however, did not specifically raise this issue before the trial court.

{¶ 52} A motion to suppress must "state with particularity the grounds upon which it is made."   Crim.R. 47; *State v. Shindler*, 70 Ohio St.3d 54, 56, 636 N.E.2d 319 (1994); *State v. Tyner*, 2d Dist. Montgomery No. 25405, 2014-Ohio-2809, ¶ 13.   "The prosecutor must know the grounds of the challenge in order to prepare his case, and the court must know the grounds of the challenge in order to rule on evidentiary issues at the hearing and properly dispose of the merits."   *Xenia v. Wallace*, 37 Ohio St.3d 216, 218, 524 N.E.2d 889 (1988).   "By requiring the defendant to state with particularity the legal and factual issues to be resolved, the prosecutor and court are placed on notice of those issues to be heard and decided by the court and, by omission, those issues which are

otherwise being waived." *Shindler* at 58. Therefore, "[t]he defendant must 'raise the grounds upon which the validity of the search or seizure is challenged in such a manner as to give the prosecutor notice of the basis for the challenge.' " *Columbus v. Ridley*, 2015-Ohio-4968, 50 N.E.3d 934, ¶ 22 (10th Dist.), quoting *Wallace* at paragraph one of the syllabus. The failure to do so results in the waiver of that issue on appeal. *Id.*; *State v. Geiger*, 10th Dist. Franklin No. 15AP-1120, 2016-Ohio-7571, ¶ 8; *State v. Luther*, 2d Dist. Montgomery No. 28908, 2021-Ohio-2697, ¶ 20.

**{¶ 53}** In this case, Davis's motion to suppress did not specifically argue that the officers' warrantless search of the nightstand warranted the suppression of the gun discovered therein. Davis's initial motion to suppress generally stated that Davis was moving to suppress "all evidence discovered as a result of * * * the * * * warrantless search of his hotel room," but no specific argument was ever articulated on that matter. Instead, the motion focused on Davis's being questioned in violation of *Miranda*.

**{¶ 54}** Davis's post-hearing memorandum in support of his motion to suppress also did not include an argument pertaining to the warrantless search of the nightstand. Rather, the memorandum only raised two arguments: (1) that the officers' entry into his hotel room was an unlawful, warrantless entry because the officers had not yet confirmed his arrest warrant; and (2) that the officers conducted a custodial interrogation in violation of *Miranda* for which the public safety exception did not apply. Prior to announcing its ruling, the trial court briefly recapped the two issues raised in Davis's memorandum, and Davis did not thereafter object or indicate that he was also arguing that the search of the nightstand was unconstitutional. Accordingly, the trial court issued a decision that

addressed only on the two issues raised in Davis's post-hearing memorandum.

**{¶ 55}** Because Davis failed to argue that the warrantless search of the nightstand was unlawful during the trial court proceedings, Davis has waived that issue for appeal. " 'It is settled law that issues raised for the first time on appeal and not having been raised in the trial court are not properly before this court and will not be addressed.' " *Luther,* 2d Dist. Montgomery No. 28908, 2021-Ohio-2697, at ¶ 21, quoting *State v. Schneider*, 2d Dist. Greene No. 1995-CA-18, 1995 WL 737910, *1 (Dec. 13, 1995).

**{¶ 56}** That said, even if Davis had challenged the search of the nightstand during the trial court proceedings, the argument would have likely failed. We have already decided that Officer Short's questions and Davis's answer concerning whether there were any knives or guns in the hotel room were admissible under the public safety exception. Since Davis informed the officers of the existence and location of a gun in the nearby nightstand, it would have been unreasonable for the officers not to retrieve it. *United States v. Newsome*, 475 F.3d 1221, 1226 (11th Cir.2018) ("It would defy common sense to allow officers to question Newsome as to whether there was any threat and then prevent them from neutralizing that threat. The gun was found as a direct result of Newsome's statement.").

**{¶ 57}** Because all three of Davis's suppression arguments fail, his sole assignment of error is overruled.

## Conclusion

**{¶ 58}** Having overruled Davis's sole assignment of error, the judgment of the trial

court is affirmed.

. . . . . . . . . . . . .

TUCKER, P.J., concurs.

DONOVAN, J., dissents:

{¶ 59} In my view, *Albrektsen,* 151 F.3d 951, and *Cooper,* 2d Dist. Montgomery No. 20845, 2005-Ohio-5781, are controlling authority. Thus, the entry into Davis's hotel room was unlawful, and the Fourth Amendments of the Ohio and U.S. Constitutions warrant reversal. Read together, *Payton,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639, and *Steagald v. United States,* 451 U.S. 204, 101 S.Ct. 1642, 1650, 68 L.Ed.2d 38 (1981) permit a limited entry into a home or hotel room when necessary to locate and arrest the suspect. This was not the factual scenario herein. Rather, this case was completely analogous to *Albrekston*, where the court stated: "[The officer] knew that Albrekston was not somewhere back in the room; he was standing right before [the officer] at the threshold. * * * [T]he arrest of Albrekston with a warrant could have been effected at the doorway of his motel room. It should have been, there was no need to do otherwise." *Albrekson* at 954.

{¶ 60} As noted by the Second Circuit Court of Appeals in *United States v. Allen*, 813 F.3d 76 (2d Cir.2016):

"[W]hen it comes to the Fourth Amendment, the home[2] is first among equals." Florida v. Jardines, __ U.S. __, 133 S.Ct. 1409, 1414, 185 L.Ed.2d 495 (2013). At the Amendment's "very core stands the right of a man to retreat into his home and there be free from unreasonable governmental intrusion." Silverman v. United States, 365 U.S. 505, 511, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961). In Payton v. New York, * * *, the Supreme Court held that, in the absence of exigent circumstances, the Amendment prohibits law enforcement officials from making a warrantless and nonconsensual entry into a suspect's home to arrest him.

(Footnote added.) Id. at 77-78.

{¶ 61} The facts in Allen were as follows. Police officers proceeded to Allen's home, planning to arrest him for assault. Id. at 78. Hearing the officers' knock on the door, Allen stepped onto his second floor porch, and an officer asked him to come down and talk to them. Id. at 79. Allen did so, and the officers subsequently advised him that he "would need to come down to the police station to be processed for the assault. In other words, he was under arrest." Id. Allen, who was shoeless, asked if he could retrieve his shoes and advise his daughter upstairs that he was leaving. Id. "The officers advised Allen that he could not return upstairs unless they accompanied him,

---

[2] " '[T]he Fourth Amendment protection against unreasonable searches and seizures is not limited to one's home, but also extends to such places as hotel or motel rooms.' " United States v. Bautista, 362 F.3d 584, 589 (9th Cir.2004), quoting United States v. Cormier, 220 F.3d 1103, 1108-1109 (9th Cir.2000). A registered hotel guest has a reasonable expectation of privacy in his room under the Fourth Amendment. See, e.g., State v. Wright, 8th Dist. Cuyahoga No. 99531, 2013-Ohio-4473, ¶ 8; State v. Oliver, 2018-Ohio-3667, 112 N.E.3d 573 (8th Dist.).

which they did." *Id.* When the officers were inside, Allen was asked if he had anything in his pockets, and he produced seven bags of marijuana. *Id.* Officers also found drug paraphernalia in plain view. *Id.* Based upon their discoveries, the officers obtained a search warrant, which lead to the recovery of a hand gun and drug paraphernalia. *Id.* Allen was arrested "on the federal charge of being a felon in possession of a firearm." *Id.*

{¶ 62} The district court denied Allen's subsequent motion to suppress, concluding that "Allen submitted to the officer's authority once he asked for permission to say goodbye to his daughter and retrieve his shoes." *Id.* at 80. Considering *Payton*, the district court determined that "the 'pivotal inquiry is whether law enforcement crossed the threshold of the home in order to effectuate the arrest.' " *Id.* The court concluded that Allen's arrest did not violate the Fourth Amendment. *Id.*

{¶ 63} The Second Circuit, quoting *Payton*, noted "that 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.' " *Id.* citing *Payton* at 585. The court noted that it "is therefore settled law that, at a minimum, law enforcement officers violate *Payton* when, in the absence of exigent circumstances or consent, they physically enter protected premises to effect a warrantless search or arrest." *Id.* at 81.

{¶ 64} Relying on *United States v. Reed*, 572 F.2d 412, 423 (2d Cir.1978), the Second Circuit concluded as follows:

We believe that a careful reading of *Reed* establishes a precedent,

binding on this panel, that when officers approach the door of a residence,

announce their presence, and place the occupant under arrest when he or she, remaining inside the premises, opens the door in response to the police request, the arrest occurs inside the home, and therefore requires a warrant. * * *

*Id.* at 85.

{¶ 65} The following was significant to the Second Circuit:

There is no dispute in this case that Allen was *arrested* while still in his home. The government does not contend that Allen was free to refuse the officers' command that he would have to come to the police station with them, or that a "reasonable person" would have felt free to do so. *See United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980).[3] The government does not and could not contend that Allen made a consensual decision to accept a police invitation to discuss matters with them at another location. From the point at which the officers told Allen that he would need to come down to the police station to be processed for the assault, they had asserted control over his person. Allen reasonably believed that he needed the officers' permission to return upstairs to get his shoes and to say goodbye to his daughter, and the officers confirmed that belief, advising him that he could go upstairs *only if* he was accompanied by one or more officers. The result of the "across the

---

[3] "[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Mendenhall* at 554.

threshold" arrest was exactly the same as if the officers had entered the apartment and arrested Allen inside, save that the intrusion into the apartment's interior followed rather than preceded the announcement that Allen was under arrest.

By advising Allen that he was under arrest, and taking control of his further movements, the officers asserted their power over him inside his home. That they did so is evident if we consider what would have happened if Allen, after being told in effect that he was under arrest, had simply closed the door and retreated deeper into his home. It is inconceivable that the officers would at that point have shrugged their shoulders and turned away. An arrested person is, and should be, arrested: When the police are authorized to take a person into custody, and undertake to do so, they must have the authority to make the arrest effective if the suspect refuses to comply.

(Footnote added; emphasis sic.) *Id.* at 86.

**{¶ 66}** It was also significant to the Court that in the absence of exigent circumstances, "the availability of telephonic warrants, the ability of officers to surveil the home until a warrant is obtained, and power to make a warrantless arrest if the suspect emerges from his home into the street * * * should permit effective arrests in virtually all cases." *Id.* at 87. The court concluded that, pursuant to *Payton*, "the Fourth Amendment protections, which are at their zenith in the home, are adequately protected." *Id.* at 89.

{¶ 67} Furthermore, as this Court has previously noted:

Miranda warnings are required only "when an individual is taken into custody or otherwise deprived of his freedom in any significant way and is subjected to questioning." *Miranda v. Arizona* (1966), 384 U.S. 436, 478, 86 S.Ct. 1602, 16 L.Ed.2d 694. Questioning alone does not trigger the requirement; the subject must also be in custody. *State v. Biros* (1997), 78 Ohio St.3d 426, 678 N.E.2d 891. Custody does not exist when a reasonable person in the suspect's position would not [sic] have felt free to end the interrogation and leave. *United States v. Mendenhall* (1980), 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497.

"Only a custodial interrogation triggers the need for a *Miranda* rights warning." *Berkemer v. McCarty* (1984), 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317. Custodial interrogation is defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda, supra.*

*State v. Goodspeed*, 2d Dist. Montgomery No. 19979, 2004-Ohio-1819, ¶ 21-22.

{¶ 68} At the time three armed police officers entered Davis's hotel room they possessed neither an arrest warrant nor a search warrant. In fact, the solitary officer, Scott Short, who testified at the suppression hearing regarding entry into Davis's hotel room, stated that he had not confirmed the warrant prior to going into the hotel. Tr. at p. 10. On cross examination, the following exchange occurred:

Q. Why is it that you do not confirm warrants before you confront individuals?

A. That's - - we have to make sure we speak with the individual and have them secured before we confirm a warrant.

Q. Well, you secure them and then you do whatever you do to confirm it. What would happen if there wasn't a legitimate warrant?

Q. You confront the individual - -

A. Uh-huh.

Q. - - and you run through - - you try to confirm it and you can't confirm it, they say, no, that's - - there's - - we have no warrant or something to that effect. What happens then?

A. Then we let them go.

Q. * * * Why wouldn't you confirm it before you have the confrontation because officer safety kicks in once you confront somebody that had [a] warrant, doesn't it - - doesn't it?

A. There's always an officer safety issue when we talk to somebody, but we wouldn't confirm a warrant unless we met with that person.

Q. Okay.

A. Because why would we confirm a warrant if we're not talking to anybody?

Tr. at p. 20.

{¶ 69} I re-emphasize, even if there had been a confirmed warrant, the mere

existence of an arrest warrant does not authorize entry into a defendant's home (or hotel room) where there is no necessity to enter because the defendant can be arrested at the threshold. *See Albrektsen,* 151 F.3d at 955. Here, Davis opened his door in response to the officers' command to do so and remained just inside his hotel room, where Fourth Amendment protections clearly extended. Rather than asking him to step outside of the room into the hallway, the armed officers, one of whom carried a rifle, effectively arrested Davis by means of their entry into the room and subsequent control of his further movements, all without a search warrant or confirmed arrest warrant. In the course of this "across the threshold arrest," the officers lacked the authority to make the arrest effective if Davis had refused to comply with them. Davis, like the defendant in *Allen*, was clearly not free to decline to speak to the officers. Under these circumstances, and since Davis was in custody, he was entitled to *Miranda* warnings at the start of the encounter.

{¶ 70} As to Davis's state of dress and the fact that it was February, he had pulled on gym shorts, and there is certainly no seasonal or attire exception to Fourth Amendment protections. The arrest could have been readily effectuated in the enclosed hotel hallway or entryway to Davis's room. Thereafter, the bathroom could have been cleared as there was no suggestion any other occupants/guests were in the hotel room.

{¶ 71} Furthermore, the trial court's reliance on *Chavez,* 2d Dist. Montgomery No. 27840, 2018-Ohio-4351, was erroneous as Chavez, along with his co-defendant, Ramirez, refused for 20 to 30 minutes to open the hotel room door upon command when the officers possessed a valid warrant for a third individual, Cardenas. The officers had

a reasonable belief that Cardenas was inside the room and thus were allowed to enter the room to locate and effectuate Cardenas's arrest. The nature of the warrant, the smell of marijuana, and the observation of a man matching Cardenas's description gave Sergeant Chiles reasonable belief that Cardenas was hiding inside the room.

{¶ 72} Notably, Chavez and Ramirez were arrested in the hallway after being ordered out of the room. After they exited the hotel room and told the officers that they were not Cardenas, the officers were not able to see certain areas of the hotel room where Cardenas could have been hiding. Significantly, Chavez consented, saying, "go look for yourself." Further, upon entering, Sergeant Chiles was met with resistance when trying to open the bathroom door. Thus the officers had a reasonable belief that someone posing a danger to the officers was inside the bathroom. *Chavez* is obviously distinguishable from this case in multiple respects.

{¶ 73} Lastly, the trial court's factual finding that an officer had spoken to a "detective" before the hotel room was breached is also erroneous. There was no mention of a detective in either the oral testimony or the video until after the gun was recovered; then Officer Diltz stated, "Their detectives in Columbus, their task force needs to be notified. * * * She sent me the phone number." Video at 20:42.

{¶ 74} Accordingly, I would reverse, finding a violation of the Fourth Amendment under the Ohio and U.S. Constitutions. I would also find a Fifth Amendment violation. Davis should have been *Mirandized* as he clearly was deprived of his liberty in a significant fashion. Furthermore Davis's motion to suppress adequately raised all pertinent issues and the concept of waiver does not apply to the illegal search of the

nightstand.

Copies sent to:

Mathias H. Heck, Jr.
Lisa M. Light
Angelina N. Jackson
Hon. Mary E. Montgomery